**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| MICHELLE CORRALES, Special Administratrix of the Estate of Diego Corrales, and GARY SHAW PRODUCTIONS, LLC,<br><br>    *Plaintiffs*,<br><br>vs.<br><br>FERNANDO BELTRAN AND JOSE LUIS CASTILLO,<br><br>    *Defendants*. | 2:07-cv-00827-RCJ-PAL<br><br>**ORDER** |

**I. INTRODUCTION**

Before the Court is Defendants' Motion for Summary Judgment (#50) pursuant to Federal Rule of Civil Procedure 56 and Plaintiff's Motion to Take Judicial Notice of a court order in the related action pursuant to Federal Rule of Civil Procedure 56(f). Plaintiff brought this action based on allegations of fraudulent transfers of assets between the Defendants to elude the Orders of Attachment and Writs of Garnishment on Defendant Castillo's purse that Plaintiff had obtained. The Court has considered the pleadings and arguments of all parties.

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (#50) is DENIED and Plaintiff's Motion for Judicial Notice (#77) is DENIED AS MOOT.

## II. BACKGROUND

**A.    Procedural Background**

Plaintiff Michelle Corrales brings this action as the executrix of her deceased husband's estate, former fighter Diego Corrales.  A separate litigation entered into, *Corrales v. Castillo*, 2:07-cv-00141-LRH-LRL, was brought against Castillo for his failure to make weight for the world championship fight scheduled between the two.  This will be termed the "Principal Action." (#65 at 2).  Castillo scheduled two prize fights after this action and Plaintiff obtained Orders of Attachment and Writs of Garnishment in relation to the purses from these fights.  *Id.*

Defendant Jose Luis Castillo is a prize fighter. (#50 at 2).  He believes his only promoter is Top Rank, and that Defendant Beltran works for Top Rank. (#65 at 4).  He also believes that Defendant Beltran does not receive a percentage of his fight purses. (#65 at 3).

Top Rank, a non-party to this action, with Robert Arum as its president, has acted as Castillo's U.S. promoter.  Arum in his deposition made it clear that he does not know who the president of the co-promoter company, Mera Servicios, is, but rather has dealt solely with Defendant Beltran by oral contract. (#50-2, at 6, Dep. of Arum, 6–9).  His former finance controller, John Belium, left the company in December of 2007 and Arum is unable to answer for many financial contradictions in his books.  *Id.*

Defendant Fernando Beltran has been involved in promoting Castillo's fights in Mexico.  *Id.*  Defendant Beltran owns a sports promotional company, Zanfer Promotions, and apparently works as a representative of Mera Servicios, a Mexican sports promotional company.  *Id.*  Mera Servicios has an agreement with Top Rank, but not with Defendant Castillo himself. (#50-2, at 27, Dep. of Beltran, 28, ¶¶ 14–23).

**B.    Purse Earnings**

The earnings for Castillo's fights were as follows:

(1)    Castillo versus Casamayor, December 4, 2004: $200,000.

(2) Castillo versus Diaz, March 5, 2005: $250,000.
(3) Castillo versus Corrales, May 7, 2005: $300,000.
(4) Castillo versus Corrales, October 8, 2005: $1.2 million (though he failed to make weight, they fought anyway).
(5) Castillo versus Corrales, June 3, 2006: Castillo failed to make weight again, and the fight did not occur nor did he receive any purse for it.
(6) Castillo versus Ngoudjo, January 20, 2007: $220,000.
(7) Castillo versus Hatton, June 23, 2007: $500,000 (proposed agreement set this for a $800,000 purse, but Top Rank did not sign it).

**C.     Plaintiff's Allegations**

Plaintiff alleges that Defendants engaged in a scheme to protect Defendant Castillo's purse monies from the Order of Attachment and Writ of Garnishment against them from the Principal Action by fraudulently transferring the monies to Castillo in Mexico. (#65 at 2). He allegedly orchestrated this by having Top Rank pay him artificially low profits from his purse to him, while simultaneously distributing inflated profits and training expenses to Defendant Beltran. The surplus would then be reallocated to Castillo in Mexico where he owns several homes. *Id.* The money, once in Mexico, apparently would be free from the restraining orders and writs secured against his purse monies.

### III. DISCUSSION

**A.     Standard for Summary Judgment**

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is proper if the evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). As summary judgment allows a court to dispose of factually unsupported claims, the court construes the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazari*, 84 F.3d 1194, 1197 (9th Cir. 1996).

1    In evaluating the appropriateness of summary judgment, three steps are necessary: (1)
2 determining whether a fact is material; (2) determining whether there is a genuine issue for the trier
3 of fact, as determined by the documents submitted to the court; and (3) considering that evidence in
4 light of the appropriate standard of proof. *Id.* As to materiality, only disputes over facts that might
5 affect the outcome of the suit under the governing law will properly preclude the entry of summary
6 judgment. Factual disputes which are irrelevant or unnecessary will not be considered. *Id.* Where
7 there is a complete failure of proof concerning an essential element of the nonmoving party's case,
8 all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of
9 law. *Celotex*, 477 U.S. at 323. Summary judgment is not a disfavored procedural shortcut, but an
10 integral part of the federal rules as a whole. *Id*.

11 **B.    The Disputed Issues of Fact**

12    Defendants contend that Plaintiff has submitted no evidence to establish the existence of
13 genuine issues of material fact in the following areas: a) discrepancies as to Defendant Beltran's role
14 with regard to Defendant Castillo and the lack of promotional services provided therein; b) the small
15 size of Castillo's purse for the second and third Corrales fights relative to Corrales' purse and the
16 small size of Castillo's purse for the Hatton fight relative to the profits received by Defendant
17 Beltran and Top Rank small size of Defendant Castillo's purses; and c) Arum's statements that
18 "there were plenty of things done" for Castillo and that Beltran had helped to fund Castillo's family
19 home construction. (#50 at 7).

20    **1.    Discrepancies with Regard to Defendants' Roles**

21    Defendants argue that it was clear that Beltran promoted Castillo on behalf of Mera
22 Servicios. (#50 at 8). They defend that Beltran does work for a Mexican boxing promotional
23 company called Mera Servicios and that in that role, he worked with Top Rank to promote Castillo's
24 U.S. fights to the Mexican audience. *Id.* Mera Servicios received promotional fees from Top Rank,
25

1  and those fees were not paid to Beltran individually. *Id.* at 9. Any payments Beltran received were
2  paid to him by Mera Servicios. *Id.*

3        Plaintiff offers disputed issues of material fact from four main sources: Castillo, Beltran,
4  Arum, and their self-contradictory testimony in order to maintain that genuine issues of fact exist as
5  to this relationship and its contribution to the alleged fraudulent transfers. First, Castillo believes
6  that Beltran is an employee of Top Rank and that he does not receive a cut of Castillo's purses. (#65
7  at 3). On Beltran's side, he had submitted an affidavit for a related litigation in New York, on
8  August 18, 2006 that acting in the capacity of representative of his company, Zanfer Promotions, he
9  enters into promotional rights agreements with "fighters, such as Castillo." *Id.* at 4. Other
10 statements he made in that deposition about his relationship with Top Rank could be construed to
11 indicate that he worked in his own personal capacity, and not as a representative of Mesa Servicios,
12 when negotiating for fees. *Id.* In that affidavit he denied claims of being Castillo's manager, and
13 instead asserted that he was his co-promoter. *Id.* at 5. In this action, however, in his April 11, 2008
14 deposition, he stated that he is not Castillo's co-promoter with Top Rank but a mere agent of a
15 separate Mexican company, Mera Servicios, that works with Top Rank. *Id.* Such contradiction
16 bears on his credibility and the difficulty in tracking payments and flow of funds. Lastly, Arum, a
17 non-party of interest, has made many contradictory statements as to ownership of the promotional
18 rights to Castillo's fights, the varying percentage entitlement to Castillo's purses, and the nature of
19 Beltran's relationship to Mera Servicios and Top Rank. *Id.* at 6–7.

20       There is a genuine issue of fact as to how Beltran was promoting Castillo, who he worked
21 for, and if he was his promoter or his manager.

22       **2.  Small Size of Castillo's Purses and Arum's Statements**

23       Defendants argue that there is no inference of improper behavior to be drawn from the size
24 of Castillo's purses. (#50 at 9). Market conditions are the alleged reason for the amounts of the
25 purse. *Id.* Castillo's reputation had been damaged by the time he reached the "Hatton" fight, as he

had failed to make weight twice. *Id.* That is the proffered reason for his small purse, as opposed to an intent to siphon off funds to avoid the orders and writs of the court. *Id.* Defendants also claim that Castillo hoped to have another opportunity to fight Hatton in London, and that this first, low-purse fight, would be a draw to set a larger purse later. *Id.* at 10.

Plaintiff points out the oddity of the small purse sizes for both the Ngoudjo fight and the Hatton fight. For the Ngoudjo fight, the purse was $220,000. From that, Castillo had to pay $150,000 to the Nevada State Athletic Commission as a fine for his repeated failure to make weight; $33,646.75 deducted by Top Rank to pay the IRS (a suspiciously small withholding, handled by Top Rank and not Castillo); $22,000 to doping fees; $7,150 for sanctioning fees; $5,000 for Top Rank expense reservation fee; and the remaining $2,203.25 as attached by Plaintiff. By these numbers, Defendant Castillo did not actually make a profit on the fight. *Id.* at 15–16. Yet in conflicting statements, it would appear he was paid an advance amount of money that is unaccounted for by Top Rank in 2007. Without any direct compensation, a question of fact remains as to what Castillo's incentive was to fight and, if he were receiving supplemental income, where that money was coming from.

In the Hatton fight, the questions of fact become even more obvious. Castillo trained for this fight, originally to be a $800,000 purse and then diminished to $500,000 after the Plaintiff gave notice to attach Castillo's purse for the fight. (#65 at 17). Castillo received a $125,000 advance on the fight. He consented to the decrease in purse size because he believed a new, oral agreement had been made by the parties that if he won, he would go to England and make millions of dollars. *Id.* at 18. The circumstances surrounding the re-adjustment of the figure by $300,000 seem suspicious. With the new figure, Top Rank's documents show Castillo was paid $41,000 for the fight and yet he owed more than $75,000 to the training camp he attended in preparation for the fight. *Id.* at 20. He was also apparently compensated $100,000 in training expenses, but he does not recall it. *Id.* at

20–21. Also disconcerting is that Mera Servicios was paid a third of the profits of the fight at $500,000, a number astronomically higher than what it received for the Ngoudja fight ($15,000–20,000). *Id.* at 21. This difference was justified by Arum who testified that "Beltran had done various things for Castillo and his family in Mexico." *Id.* Legitimate questions remain as to why Mera Servicios was paid $500,000 for the Hatton fight, why Castillo was paid $300,000 less than originally bargained for, and where the $100,000 went that was supposedly given to Castillo for training expenses.

**B.    The Fraud Analysis**

The Plaintiff brings her causes of action for fraudulent conveyances under N.R.S. 112.180(1)(a), N.R.S. 112.180(1)(b), and N.R.S. 112.190(1). The first two statutes provide for:

1)   A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
   a)   With actual intent to hinder, delay or defraud any creditor of the debtor; or
   b)   Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . .
2)   Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they become due.

Also, N.R.S. 112.190(1) requires proof that the debtor made the transfer while he was insolvent or that it rendered him insolvent. N.R.S. 112.180(2) assembles a list of potential "badges of fraud" including the following:

   a)   The transfer or obligation was to an insider;
   b)   the debtor retained possession or control of the property transferred after the transfer;
   c)   the transfer or obligation was disclosed or concealed;
   d)   before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
   e)   the transfer was of substantially all the debtor's assets;
      . . .
   g)   The debtor removed or concealed assets;
      . . .
   I)   The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
   j)   The transfer occurred shortly before or after a substantial debt was incurred[.]

When "badges of fraud" are present in sufficient number, this may provide for an inference that fraud is indeed occurring. *Steel Co. v. Morgan Marshall Indus.*, 278 Ill. App. 3d 241, 251 (Ill. App. Ct. 1st Dist. 1996). The California Court of Appeals made it clear that "[t]here is no minimum number of factors that must be present before the scales tip in favor of finding of actual intent to defraud. This list of factors is meant to provide guidance to the trial court, not compel a finding one way or the other." *Filip v. Bucurenciu*, 129 Cal. App. 4th 825, 834 (Cal. App. 3d Dist. 2005).

Defendants argue that none of the factors are supported by evidence, and misconstrue the law to state that evidence of a few badges is *not* enough to create a genuine issue of fact. (#50 at 13). Plaintiff properly points out the law and cites the following disputed issues as potential evidence of the "badges of fraud." (#65 at 28). As badges of fraud: a) Castillo believes Beltran is an insider, as he thinks he works for Top Rank according to his testimony; b) transfers here were concealed as profit distributions and training expenses not justified by the economics of the fight; c) Castillo had been sued before the transfers were made; d) upon the deductions, transfers constituted substantially all of his assets, in that they were his income from two fights: Ngoudjo and Hatton; e) Castillo removed the assets from the U.S. and took them to Mexico; f) Mera Servicios did not actually provide services to match its compensation; g) Castillo was rendered insolvent by the transfers; and h) the transfers took place just after the debt was incurred, when the Orders of Attachment and Writs of Garnishment were issued with respect to Castillo's purses for the Ngoudjo and Hatton fights. *Id.* at 28–29.

Genuine issues of fact remain as to whether or not Defendants were indeed in violation of N.R.S. 112.180(1)(a), N.R.S. 112.180(1)(b), and N.R.S. 112.190(1).

**C.    Plaintiff's Motion for Judicial Notice**

A Rule 56(f) motion requires an affidavit to demonstrate "how additional discovery would preclude summary judgment and why a party cannot immediately provide 'specific facts' demonstrating a genuine issue of material fact." *United States v. One 1985 Mercedes*, 917 F.2d 415,

1  418 (9th Cir. 1990) (citation omitted). The Rule provides for the court's discretion to deny or
2  continue a motion for summary judgment if the opposing party needs time to discover essential facts.
3  *See Cali. Union Ins. Co. v. Am. Diversified Sav. Bank*, 914 F.2d 1271, 1278 (9th Cir. 1990).

4      Plaintiff requests that the Court "amplify the record in opposition to Defendants' motion for
5  summary judgment" by taking judicial notice of Judge Leavitt's September 3, 2008 Order in the
6  related action, *Corrales v. Castillo*. In the Order, Defendant Beltran was held in contempt of court
7  for his failure to turn over discovery. Plaintiff presents an affidavit with its motion. Defendants
8  acknowledge the Court's discretion in determining whether to take judicial notice but discourage it
9  since the Plaintiff has not specified the additional discovery she anticipates or how it would preclude
10 summary judgment.

11     At this time, the Court declines to take judicial notice of Judge Leavitt's order as it has little
12 impact on the motion for summary judgment before the Court and because in her affidavit, Plaintiff
13 has failed to demonstrate how Beltran's contempt of court would preclude summary judgment.

14 **IV. CONCLUSION**

15     IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (#50) is
16 DENIED and Plaintiff's Motion for Judicial Notice (#77) is DENIED as moot.

17     DATED: July 13, 2009

20                               ROBERT C. JONES
                                UNITED STATES DISTRICT JUDGE